Slip Op. 19-149

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| PRYSM, INC., | |
| Plaintiff, | Before: Jane A. Restani, Judge |
| v. | |
| UNITED STATES, | Court No. 18-00151 |
| Defendant. | PUBLIC VERSION |

### OPINION

[In Customs classification matter, Plaintiff's motion for summary judgment is denied and Defendant's cross-motion for summary judgment is granted.]

Dated: November 26, 2019

Munford Page Hall, II and Lydia C. Pardini, Adduci, Mastriani & Schaumberg, L.L.P., of Washington, D.C., for Plaintiff Prysm, Inc.

Marcella Powell, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, and Amy M. Rubin, Assistant Director, International Trade Field Office, U.S. Department of Justice, of New York, N.Y., for Defendant United States of America. With them on the brief was Joseph H. Hunt, Assistant Attorney General, Civil Division, U.S. Department of Justice, of Washington, D.C. Of counsel on the brief was Paula S. Smith, Senior Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs & Border Protection, of New York, N.Y.

Restani, Judge: This matter is before the court on cross-motions for summary judgment.

Plaintiff Prysm, Inc. ("Prysm") commenced this action against Defendant United States (the "government") to contest the denial by U.S. Customs and Border Protection ("Customs") of its administrative protests. Prysm principally claims that Customs incorrectly determined the tariff classification of its imported laser phosphor displays ("LPDs"), which Prysm claims were manufactured for use as "parts of" its Display Wall System, a "monitor." The government replies

that Prysm's LPDs were manufactured for use as independent "monitors" and are classifiable

accordingly.

There are two issues in this case.  First, the court must determine whether Prysm's

merchandise is a "monitor," classifiable under heading 8528, Harmonized Tariff Schedule of the

United States ("HTSUS"),[1] or a "part" of a monitor, classifiable under heading 8529, HTSUS.  If

the merchandise is a monitor, then the court must also determine whether the monitor is principally

used in an automatic data processing system and classifiable under subheading 8528.51.00,

HTSUS, as claimed by Prysm.[2]  For the reasons that follow, the court concludes that the LPDs are

properly classifiable under subheading 8528.59.33, HTSUS as a color monitor, not incorporating

television reception apparatus, with a video display diagonally greater than 34.29 centimeters, with

a flat panel screen, other; other, subject to a 5 percent ad valorem duty, as asserted by the

government.

---

[1] All citations to the HTSUS, including Section and Chapter Notes, are to the 2016 edition.  This version was in effect on December 7, 2016, when Prysm entered the merchandise.  See 19 C.F.R. § 141.69.

As of January 1, 2017, subheading 8528.51.00 was deleted and replaced with subheading 8528.51 (for monitors "[c]apable of directly connecting to and designed for use with an automatic data processing machine of heading 8471").  Subheading 8528.59.31 was also deleted.  Those changes, which might have precluded some of Prysm's arguments here, are inapplicable to the instant case.

[2] At oral argument, Prysm abandoned its secondary alternative claim that its merchandise is a flat panel display device classifiable under heading 8528.59.31, HTSUS.  See Oral Arg. Recording at 28:20–29:06 (Nov. 14, 2019).  Many subheadings of heading 8528, HTSUS, reference flat panel screens, such as the one applicable here.  A flat panel screen is distinct from the complete object, known as a flat panel display device, of which a flat panel screen is a part.  Flat panel display devices are classified under subheading 8528.59.31, HTSUS.  By contrast, a device with a flat panel screen, but that is not wholly a flat panel display device, is not classified under that subheading.

## BACKGROUND

On December 7, 2016, Prysm entered the subject LPDs at San Francisco. <u>See</u> Customs Entry Form 1651-0024, ECF No. 31-3 at 40 (Dec. 8, 2016) ("Pl. Ex. 2"). Customs classified the LPDs under subheading 8528.59.33, HTSUS. <u>See</u> [Pl.'s] Statement of Material Facts as to Which There Is No Genuine Issue To Be Tried ¶¶ 10–11, ECF No. 31-1 (Mar. 15, 2019) ("Pl. Facts"); Def.'s Resp. to Pl.'s Statement of Material Facts as to Which There Is No Genuine Issue To Be Tried ¶¶ 10–11, ECF No. 37 (May 24, 2019) ("Gov. Facts"). Prysm timely filed a protest on December 13, 2017. Pl. Facts ¶ 12; Gov. Facts ¶ 12. Prysm disagrees with this classification and claims that the LPDs are properly classified under subheading 8529.90.99, HTSUS, as "[p]arts suitable for use solely or principally with the apparatus of headings 8525 to 8528," free of duty. <u>See</u> Corrected Compl. ¶¶ 36–38, ECF No. 9 (July 20, 2018). Prysm requested an accelerated disposition of its protest, and the protest was deemed denied on June 23, 2018, pursuant to 19 U.S.C. § 1515(b). Pl. Facts ¶ 13; Gov. Facts ¶ 13. Prysm timely commenced the instant action on June 25, 2018. Pl. Facts ¶ 1; Gov. Facts ¶ 1. Prysm moved for summary judgment on March 15, 2019, and the government cross-moved for summary judgment on May 24, 2019. <u>See</u> Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J., ECF No. 31 (Mar. 15, 2019) ("Pl. Br."); Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. & in Support of Def.'s Cross-Mot. for Summ. J., ECF No. 37 (May 24, 2019) ("Gov. Br.").

## JURISDICTION

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(a), which vests the Court of International Trade with exclusive jurisdiction over any civil action commenced against the United States to contest the denial of a protest under Section 515 of the Tariff Act of 1930, <u>codified as amended</u>, 19 U.S.C. § 1515.

## STANDARD OF REVIEW

The court reviews the denial of a Customs classification protest de novo.  See Pillowtex Corp. v. United States, 171 F.3d 1370, 1373 (Fed. Cir. 1999); FANUC Robotics Am., Inc., 393 F. Supp. 3d 1254, 1258 (CIT 2019).  The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT R. 56(a).  A factual dispute is material if it potentially affects the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In a tariff classification dispute, "summary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is."  Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998).  The court's inquiry is two-fold.  First, the court ascertains the proper meaning of specific terms in the tariff provision.  Cummins Inc. v. United States, 454 F.3d 1361, 1363 (Fed. Cir. 2006).  Second, the court determines whether the merchandise meets the provision's terms as properly construed.  Id.

## PRYSM'S DISPLAY WALL SYSTEM

Prysm imports certain tile displays, known as "TD1 Tiles" (first generation) and "TD2 Tiles" (second generation).   Pl. Facts ¶¶ 8–9, 14; Gov. Facts ¶¶ 8–9, 14.  These tile displays are types of laser phosphor displays. Pl. Facts ¶ 15; Gov. Facts ¶ 15.[3]  On December 7, 2016, Prysm

---

[3] Prysm imports the TD1 Tiles separately from their power supply and fan assembly components, while the TD2 Tiles are imported with their power supply and fan assembly components attached. Pl. Facts ¶ 17; Gov. Facts ¶ 17. Nevertheless, the parties agree that the TD1 Tiles and the TD2 Tiles are the same product for the purposes of classification.  Pl. Facts ¶ 16; Gov. Facts ¶ 16. The parties also agree that both species of LPD are imported as complete units.  See Def.'s Add'l Statement of Undisputed Material Facts in Supp. of its Cross-Mot. for Summ. J. ¶ 4, ECF No. 37 at 21–25 (May 24, 2019) ("Gov. Add'l Facts); Pl.'s Resp. to Def.'s Add'l Statement of Undisputed Material Facts in Supp. of its Cross-Mot. for Summ. J. ¶ 4, ECF No. 42 (June 28, 2019) ("Pl. Add'l Facts").  Accordingly, the court, like the parties, refers to the TD1 and TD2 collectively as the LPDs. Pl. Facts ¶ 18; Gov. Facts ¶ 18.  Wiring diagrams for the original configuration of Prysm's Display Wall System are attached in Confidential Appendix I.

entered 92 LPDs.  See Pl. Ex. 2 at 39–41.  Prysm contends that the "subject merchandise," its

LPDs, "when combined with other LPDs and one or more" separate, proprietary components, form

a Display Wall System.  Pl. Br. at 4.  The government agrees.  See Gov. Facts ¶¶ 54–61.  The

LPDs are designed to be stacked in groups onto metal frame walls, with a gap of ½-millimeter

between each.  Pl. Facts ¶ 54; Gov. Facts ¶ 54.

The LPD can neither accept video signals nor display content unless it is connected directly

to one of two specialized, independent, proprietary apparatuses: either a first-generation

proprietary image processer ("IP1") or a second-generation proprietary image processor ("IP2")

(collectively, the "Image Processors").  Pl. Facts ¶¶ 27, 35–36; Gov. Facts ¶¶ 27, 35–36.  The

Image Processor receives its input video source from a separate display wall processor or other

image source.  Pl. Facts ¶ 67; Gov. Facts ¶ 67. [4]   A single Image Processor can control up to 30

LPDs.  Pl. Facts ¶¶ 57–58; Gov. Facts ¶¶ 57–58.  The proprietary image data and control signals

that the Image Processors send to the LPDs "are shared in a 'daisy chain' manner from the first

LPD to other LPDs in an array of tiles."  Pl. Br. at 13; Pl. Facts ¶ 60; Gov. Facts ¶ 60.  This

arrangement is known as a Display Wall System, which displays a larger, single image to the end-

user.  Pl. Facts ¶¶ 56, 59–61; Gov. Facts ¶ 56, 59–61.  In short, the Display Wall System contains

two integral components: (1) the Image Processor, a proprietary device that (a) accepts incoming,

---

[4] Although Prysm markets and sells separately a proprietary display wall processor that is designed
for use with its Display Wall System, the Image Processors can accept incoming, commercial
signals from "any video source with HDMI, DVI, or VGA output," including, inter alia, PCs and
DVD players.  Gov. Add'l Facts ¶ 18; Pl. Add'l Facts ¶ 18.  Thus, the display wall processors are
not essential to the LPD's operation.  See Dep. of Dimitris Katsis, Ph.D. at 66:6–14, ECF No. 31-
3 (Jan. 31, 2017) ("Pl. Ex. 3"); Dep. of Scott Norder at 11:6–18, ECF No. 37-1 (Nov. 3, 2017)
("Gov. Ex. F").  Where a Display Wall System operates with a display wall processor, the display
wall processor's function is to execute programs that integrate multiple video signal sources into
a single pixel canvas, and then to transmit those data to each LPD through the Image Processors.
Pl. Facts ¶ 79; Gov. Facts ¶ 79.

commercially-coded  incoming video signal data, (b) converts those data into proprietary signal

data, and then (c) sends those signals to the LPDs; and (2) the LPDs, which collectively display a

unified image to the end-user.[5]   Because the interaction between these parts is essential to the

court's determination of whether the LPDs are monitors classifiable in heading 8528 or are,

instead, parts of monitors classifiable in heading 8529, the court briefly explains how the LPDs

interact with the Image Processors within Prysm's Display Wall System.

### A.        The LPDs, the Subject Merchandise

As relevant for classification purposes, the LPD consists of an anti-glare panel, a phosphor

panel, a laser processor, and a laser engine, all of which are enclosed within a single apparatus.  Pl.

---

[5] A "basic" Display Wall System consists solely of LPDs and Image Processors, and may, but need not, include a display wall processor.  Gov. Add'l Facts ¶¶ 1–2; Pl. Add'l Facts ¶¶ 1–2.  See Confidential Appendix I.  Yet, in its moving brief, Prysm's principal argument in support of the LPDs' classification under subheading 8528.51.00 was that "the display wall processor" in the Display Wall System "is an automatic data processing machine," so that its Display Wall System "is an automatic data processing system," and therefore "an array of LPDs is an output unit for an automatic data processing system."  Pl. Br. at 25–26.  In its reply, Prysm appears to abandon its original argument, claiming instead that the LPDs, coupled with a series of additional LPDs and remote automatic data processing machines, means that the LIPDs are principally used in an automatic data processing system within the meaning of heading 8471, HTSUS; specifically, the Display Wall System.  Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. & Pl.'s Resp. to Def.'s Cross-Mot. for Summ. J. at 10, ECF No. 40 (June 28, 2019) ("Pl. Reply").  According to Prysm, the Display Wall System "includes the LPDs, one or more IPs, and a direct or indirect connection to an ADP machine."  Id. at 1.  But see id. at 6 (the Display Wall System is a "complete monitor" that is "composed of four or more LPDs and an I[mage] P[rocessor].").  Prysm now claims that whether a display wall processor is an automatic data processing machine that meets the definitional requirements of such machines "is irrelevant" for classification purposes.  Id. at 14.

At oral argument, the court requested the parties to inform it if a detailed discussion of Prysm's proprietary display wall processor was necessary.  See Oral Arg. Recording at 45:30–51:10 (Nov. 14, 2019).  Prysm was not required to, and did not, file a response.  The government agrees with the court that the display wall processors "are irrelevant to the classification of the LPDs at issue."  Def.'s Resp. to the Issues Raised by the Ct. During Oral Arg. on the Parties' Cross Mots. for Summ. J. at 2, ECF No. 55 (Nov. 14, 2019).  Prysm's most recent contention that whether a display wall processor is an automatic data processing machine "is irrelevant" for classification purposes accords with the government's position.  Pl. Reply at 14.

Facts ¶¶ 19–20; Gov. Facts ¶¶ 19–20.  It does not contain a television reception apparatus.  Pl.

Facts ¶ 44; Gov. Facts ¶ 44.  The LPD has a flat screen that measures 63.6 centimeters diagonally.

Pl. Facts ¶¶ 102, 108; Gov. Facts ¶¶ 102, 108.  Each LPD also contains an internal central

processing unit [[


]].  Def.'s Add'l Statement of Undisputed Material Facts in Supp. of its

Cross-Mot. for Summ. J. ¶¶ 10, 14, ECF No. 37 at 21–25 (May 24, 2019) ("Gov. Add'l Facts);

Pl.'s Resp. to Def.'s Add'l Statement of Undisputed Material Facts in Supp. of its Cross-Mot. for

Summ. J. ¶¶ 10, 14, ECF No. 42 (June 28, 2019) ("Pl. Add'l Facts").  Prysm admits that "[e]ach

[LPD] is equipped" with this system, which it describes as a

]], or a central processing unit ("CPU").  Pl.'s First Suppl. Resp. to Def.'s First Set of

Interrogs. at 20, ECF No. 31-3 (Feb. 5, 2019) ("Pl. Ex. 9").  This CPU contains two main

processors.  Gov. Add'l Facts ¶ 12; Pl. Add'l Facts ¶ 12; Dep. of Dimitris Katsis, Ph.D.[6] at 47:13–

21, ECF No. 40-1 at 6 (Jan. 31, 2017) ("Pl. Ex. 17"); Pl.'s Resp. to Def.'s Second Set of Interrogs.

at 226, ECF No. 37-2 (Oct. 20, 2017) ("Gov. Ex. L").[7]  The CPU controls the LPD's internal

---

[6] Dr. Katsis is the Director of Global Technical Applications and a Technical Fellow at Prysm.  Pl. Ex. 9 at 5.

[7] Specifically, the LPD contains a (1) [[                          ]] processor and (2) [[                ]] processor.  Gov. Add'l Facts ¶ 12; Pl. Add'l Facts ¶ 12.  The first processor monitors the health of the LPD unit and reads the incoming control signals from the Image Processors.  See Dep. of Dimitris Katsis, Ph.D. at 22:22–24, ECF No. 31-3 (Jan. 31, 2017) ("Pl. Ex. 3").  The second processor's main purpose is to distribute the incoming signal data to the LPD's image display machinery; namely, the lasers.  See Dep. of Dimitris Katsis, Ph.D. at 47:13–21, ECF No. 40-1 at 6 (Jan. 31, 2017) ("Pl. Ex. 17"); Pl.'s Resp. to Def.'s Second Set of Interrogs. at 226, ECF No. 37-2 (Oct. 20, 2017) ("Gov. Ex. L").  According to Dr. Katsis, "both the TD1 Tile and the TD2 Tile contain this processor system.  Decl. of Dimitris Katsis, Ph.D. ¶ 2, ECF No. 37-1 (Feb. 20, 2019) ("Gov. Ex. G").  "The difference is that TD2 Tile uses a different model of the [[
]], instead of the [[                ]] as used in the TD1 Tile.  Even though the [[
]] are different models, they perform the same functions[.]"  Id.

machinery, video data, and image display intensity, and also distributes incoming data, processes

video signals, and stores multiple frames.  Pl. Ex. 17 at 47:13–48:4; Dep. of Dimitris Katsis, Ph.D.

at 190:4–13, ECF No. 37-1 (Nov. 2, 2017) ("Gov. Ex. E.").  The CPU thus controls which "part

of the image" to display on a given LPD among an arrangement of LPDs that comprise the Display

Wall System.  Dep. of Dimitris Katsis, Ph.D. at 34:12–20, ECF No. 31-3 (Jan. 31, 2017) ("Pl. Ex.

3").  See also Pl. Facts ¶¶ 99–102; Gov. Facts ¶¶ 99–102.

## B.     The Image Processors

To display an image, the LPD must first receive a signal through a Category 7 ("CAT 7")

cable from a proprietary Image Processor, a second, independent apparatus that Prysm imports

separately from the LPDs.  Pl. Facts ¶¶ 18, 24, 31, 36, 42; Gov. Facts ¶¶ 18, 24, 31, 36, 42.  The

LPD can neither accept video signals nor display content unless it is connected directly to an Image

Processor.  Pl. Facts ¶¶ 27, 35; Gov. Facts ¶¶ 27, 35.  The Image Processors convert "consumer-

level digital signals" and data from a separate apparatus into [[

]] and then transmit that data to the LPD through a CAT 7 cable linking the LPD and the

Image Processor.  Pl. Ex. 3 at 20:7–10; Pl. Facts ¶¶ 91–92; Gov. Facts ¶¶ 91–92.  These signals

"contain[] information for every pixel in the form of RGB triads" (i.e., "red-green-blue" triads).

Pl. Ex. 9 at 22; Gov. Add'l Facts ¶ 17; Pl. Add'l Facts ¶ 17.

## DISCUSSION

The HTSUS is organized by classification headings, each of which has one or more

subheadings.  The headings set forth "general categories of merchandise," while the subheadings

"provide a more particularized segregation of the goods within each category."  Deckers Outdoor

Corp. v. United States, 714 F.3d 1363, 1366 (Fed. Cir. 2013) (internal quotation and citation

omitted).  The HTSUS also contains General Notes, Section Notes, Chapter Notes, General Rules

of Interpretation ("GRI"), the Additional United States Rules of Interpretation ("ARI"), and several appendices for particular categories of goods. See 19 U.S.C. § 3004. Each of these has the binding effect of statutory law. See BenQ Am. Corp. v. United States, 646 F.3d 1371, 1376 (Fed. Cir. 2011). Thus, the GRIs and ARIs govern merchandise classification, and the court applies them in numerical order. Id. While not binding upon the court, the court also may consider the Explanatory Notes ("ENs"), developed by the World Customs Organization ("WCO"), which are "generally indicative of proper interpretation" of the tariff schedule. See Lemans Corp. v. United States, 660 F.3d 1311, 1316 (Fed. Cir. 2011). "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citation omitted). To ascertain the proper heading under GRI 1, the court compares only the language of the headings and not the language of the subheadings. See Orlando Food Corp. v. United States, 140 F.3d 1437, 1440 (Fed. Cir. 1998).

### A.    Heading 8528, HTSUS v. Heading 8529, HTSUS

In the instant case, Prysm contends that the LPD is classifiable under heading 8529, HTSUS, which covers "[p]arts suitable for use solely or principally with the apparatus of headings 8525 to 8528."[8] Meanwhile, the government argues that the LPD is to be classified under heading 8528, HTSUS, which covers "[m]onitors and projectors, not incorporating television reception apparatus; reception apparatus for television, whether or not incorporating radio-broadcast receivers or sound or video recording or reproducing apparatus."[9] Thus, the court must determine

---

[8] Headings 8525, 8526, and 8527 are inapposite and need not be addressed.

[9] In the alternative, the government argues that heading 8543, HTSUS, which covers "[e]lectrical machines and apparatus, having individual functions, not specified or included elsewhere in this chapter; parts thereof," applies to the LPDs. The court rejects this argument at the outset because

if the LPDs are "monitors," and thus classifiable under heading 8528, or "parts" of monitors,

classifiable under heading 8529.   Where a tariff classification is in dispute, "the court first

considers whether 'the government's classification is correct, both independently and in

comparison with the importer's alternative.'"   FANUC Robotics, 393 F. Supp. 3d at 1260 (quoting

Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984)).   The relevant Section and

Chapter Notes define neither "monitors" nor "parts of monitors."   While the WCO ENs likewise

fail to define the terms expressly, the court will consider them here because they are informative

as to the scope of the bounds of heading 8528.   See, e.g., Kahrs Int'l, Inc. v. United States, 713

F.3d 640, 644–45 (Fed. Cir. 2013).   The General EN to heading 8528, HTSUS provides that all

monitors are apparatuses that employ a wide array of technologies "to display images," and they

"may be capable of receiving a variety of signals from different sources."   EN 85.28 (General).

As there is no legislative intent to the contrary, the court will construe the term "monitor" in

accordance with its "common and commercial meaning[]."   Carl Zeiss, Inc., 195 F.3d at 1379.   To

do so, the court will first consider the parties' proffered "lexicographic and scientific authorities,

dictionaries, and other reliable information sources" or, if those sources prove unavailing, it will

"rely upon its own understanding" of the definition.   Irwin Indus. Tool Co. v. United States, 920

F.3d 1356, 1360 (Fed. Cir. 2019) (citations omitted).

---

heading 8528, HTSUS wholly describes the LPDs.   Cf. GRI 1.   Additionally, the parties agree that
the LPDs are imported as complete units.   Gov. Add'l Facts ¶ 4; Pl. Add'l Facts ¶ 4.   Accordingly,
the court need not inquire as to the potential applicability of headings, such as heading 8543, which
do not wholly describe the LPDs.   See Mita Copystar Am. v. United States, 160 F.3d 710, 712
(Fed. Cir. 1998).

For its part, the government points the court to four dictionaries,[10] each of which generally

defines a "monitor" in one of two ways; either, broadly, as a screen used to display various media

or, more specifically, a cathode ray tube used to display various media.  See Gov. Br. at 11–12.

The government thus concludes that a "'monitor' is a device that displays the output of a system,

or a device with a screen that shows or displays pictures or information."  Gov. Br. at 12.

Accordingly, the government contends that the term "monitor" describes the LPDs "precisely," as

they "contain a screen and . . . pictures or images are displayed on them."  Id.  Prysm, by contrast,

offers one dictionary definition and one scientific definition.[11]  See Pl. Br. at 14.   According to

Prysm, while a common dictionary definition of "monitor" is "a screen which displays an image

generated by a computer," the term is defined more precisely in "scientific authorities," which

define "monitor" as "an automatic data processing ("ADP") output device."  Id. (alterations and

citations omitted).  Because Prysm urges the court to adopt an uncommon definition of the term

"monitor," Prysm bears the burden to prove that the term "has a different commercial meaning

that is definite, uniform, and general throughout the trade."  See Carl Zeiss, Inc., 195 F.3d at 1379

(citation omitted).

Despite its assertion that "scientific authorities" afford a more precise definition of the term

"monitor," Prysm offers only one such source for support.  Specifically, Prysm points to the expert

report of Samuel Miller,[12] who explains that an automatic data processing (ADP) output device "is

---

[10] Specifically, the government points to the OXFORD ONLINE ENGLISH DICTIONARY (3d ed. 2002);
the MERRIAM-WEBSTER ONLINE DICTIONARY (unknown edition); the MACMILLAN DICTIONARY
(edition unknown); and the CAMBRIDGE ENGLISH DICTIONARY (edition unknown).  See Gov. Br.
at 11–12; Gov. Dictionary Excerpts, ECF No. 37-2 (May 24, 2019) ("Gov. Ex. K").

[11] Specifically, Prysm points to "https://en.oxforddictionaries.com" and to the expert testimony
of Mr. Samuel Miller.  See Pl. Br. at 14.

[12] Mr. Miller holds a Master of Science in Electrical Engineering from Case Western Reserve
University and identifies himself as an "Engineering Vice President."  Pl. Ex. 5, Attach. B.

an electronic visual display for an automatic data processing device."  Expert Report of Samuel

Miller at 1, ECF No. 31-3 ("Pl. Ex. 5").  Mr. Miller explains that such devices generally include

"a display element, electronic circuitry that performs various functions, a power supply, and a case

to contain the various components."  Pl. Ex. 5 at 1.  He provides a lengthy recitation of the

evolution of automatic data processing output devices and notes, in passing, that younger-

generation automatic data processing output devices with flat screens were once known as

"computer monitors."  Pl. Ex. 5 at 1.  It remains unclear exactly who understood and used this

definition and whether "the vernacular" to which he refers is or was that of individuals who deal

in the importation of such devices.  Pl. Ex. 5 at 1–2.  Mr. Miller then explains that, "[i]n the

vernacular," the combination of the Image Processor and the LPD "is not only a 'monitor,' it is

[also] a 'flat screen display device, a 'flat screen monitor.'"  Pl. Ex. 5 at 12.

  Even if Mr. Miller's explanation were specific enough to support Prysm's proffered

definition, the overwhelming quantity of Prysm's own evidence is to the contrary.  For example,

Dr. Katsis, a Prysm employee, purports to distinguish the LPDs from other monitors by claiming

that most individuals in the trade associate "monitors" with liquid-crystal displays ("LCDs"),

which "can directly interface" with "a laptop or a PC," and not with laser phosphor displays, which

cannot.  Pl. Ex. 3 at 161:6–162:22.  Dr. Katsis also claims that LPDs are distinguishable from

monitors, because whereas "the controller electronics" are "affixed" to "monitors," the "brains" of

the LPD system are contained within the separate Image Processor, a detached device.  Id. at

161:1–22.  Dr. Katsis bases his definition upon his years of experience in the display industry,

during which he concedes that he has never seen such a definition "written anywhere," and that he

"just know[s]."  Id. at 161:19–21.  Yet, Dr. Katsis readily admits that LPDs contain [[

  ]] known collectively as the computer processing unit.  Pl. Ex. 17 at 47:13–25.  Dr.

Katsis later explains that this computer processing unit processes the incoming data [[

]] within the LPD unit.   Gov. Ex. E at 189:22–190:1.

Moreover, in its interrogatory responses, Prysm stated that the LPD is a "monitor" and explained

that "[a]n embedded processor [[

]].  Pl.'s Objs. &

Resp. to Def.'s First Set of Interrogs. at 15–16, ECF No. 37-1 (Nov. 2, 2016) ("Gov. Ex. B").

Quite plainly, the LPDs employ internal technology to display images and are capable of

receiving signals from the Image Processors.  Gov. Add'l Facts ¶¶ 5–9, 11; Pl. Add'l Facts ¶¶ 5–

9, 11;  accord EN 85.28 (General).  Prysm contends that a given Display Wall System requires at

least four LPDs to operate.  Pl. Facts ¶ 65.  The parties agree that a single Image Processor can

control up to 30 LPDs "arranged in matrices of up to six columns containing five LPDs each."  Pl.

Facts ¶ 57; Gov. Facts ¶ 57.  Thus, it is possible for a given Display Wall System, as sold by Prysm,

to contain as few as four LPDs, or as many as several hundred.[13]  Dr. Katsis explains, and there is

no genuine dispute, that a single LPD, when connected to an Image Processor, can display a usable

image.  See Pl. Ex. 3 at 163:12–20.[14]  The parties further agree that the Display Wall System

displays "a full image" to which each LPD contributes, "as if it were displayed on a giant LCD

monitor" on the Display Wall.  Pl. Facts ¶ 116; Gov. Facts ¶ 116.  Given Prysm's own description

of its Display Wall System and marketing strategy, it is clear that there is no uniform, set

configuration of which any single LPD can constitute a "part," because the "whole," in the sense

---

[13] Prysm alleges that its agents sold "full" Display Wall Systems with as few as [[   ]] LPDs and
as many as [[   ]] LPDs.  Pl. Facts ¶¶ 112–13.

[14] In a "Wall of One" arrangement, by contrast, Prysm is unsure of whether a "Wall of One"
arrangement could display text data clearly.  See Pl. Ex. 3 at 163:15–16.  But because the court
finds that a device need not be capable of displaying text to satisfy the definition of "monitor," this
fact is immaterial for ascertaining the proper classification heading.  See infra.

of a full Display Wall System, is undefinable at the time of importation.  The large and the small

of it is that each LPD is a monitor that is capable of displaying an image.[15]  Thus, the court accepts

the Oxford English Dictionary's definition[16] of "monitor" as elucidated by the interpretative

guidance of EN 85.28, and concludes that, for tariff purposes, the following definition of "monitor"

applies: a monitor is a machine that receives data from an external source, and then processes and

converts that data into physical output commands to display an image.  Accordingly, the LPDs are

"monitors" within the meaning of the HTSUS, and thus they are properly classified under heading

8528.

### B.        Subheading 8528.59.33, HTSUS is the proper classification.

After determining the appropriate heading in which to classify a product, the court next

determines the appropriate subheading.  See GRI 6; Orlando Food Corp., 140 F.3d at 1440.  Prysm

contends that if "the LPD is a monitor classified in heading 8528, the LPD should be classified in

subheading 8528.51.00, HTSUS," which provides for "[m]onitors and projectors, not

incorporating television reception apparatus; other monitors: [non-cathode-ray tube monitors] of

a kind solely or principally used in an automatic data processing system of heading 8471," free of

duty.   See Pl. Br. at 25.  The government maintains that the LPD is properly classifiable in

subheading 8528.59.33, which provides for "[m]onitors and projectors, not incorporating

television reception apparatus; other monitors: [non-cathode ray tube monitors]; other: color with

---

[15] Even if, arguendo, the Display Wall System is also a "monitor" within the meaning of heading
8528, there is no authority that forecloses the notion that a monitor's component parts cannot also
be "monitors."  Indeed, taking Prysm's argument to its most expansive reach would cause two
interconnected monitors that display a unified image to each lose their status as independent
monitors, each being a "part" of the other.  The court rejects such a strained interpretation.

[16] See Monitor, n.7, OXFORD ENGLISH DICTIONARY (3d ed. 2002).

a flat panel screen; other: other." Gov. Br. at 2, 15. [17] To resolve this issue, the court must ascertain

whether the LPD is a monitor that is designed solely or principally for use with an automatic data

processing system, as that term is defined in heading 8471, HTSUS.[18]

The court begins with the text of the HTSUS and the relevant Section and Chapter Notes,

as these are statutory law.  BenQ Am., 646 F.3d at 1376.  For classification within subheading

8528.51.00, the LPD must be a monitor "of a kind solely or principally used in an automatic data

processing system of heading 8471," which provides for, inter alia, "[a]utomatic data processing

machines and units thereof."  Compare heading 8471, HTSUS with subheading 8528.51.00,

HTSUS.  Chapter Note 5 to Chapter 84 deals explicitly with those "machines" and "systems" that

are properly classifiable in subheading 8471, HTSUS.  See Ch. 84, HTSUS n.5.

---

[17] The government contends that the Federal Circuit's opinion in Optrex forecloses Prysm's argument.  See Gov. Br. at 15 (citing Optrex Am., Inc. v. United States, 475 F.3d 1367 (Fed. Cir. 2007)).  But, given the change in focus explained supra in note 5, Optrex is no longer helpful here. Further, in Optrex, the goods at issue were imported "[b]etween 1998 and 1999," prior to the enactment of the governing HTSUS provision.  Optrex, 475 F.3d at 1368.

[18] Prysm does not argue that the Image Processors, by themselves, are automatic data processing machines within the meaning of heading 8471, HTSUS.  Nevertheless, it is the court's duty to reach the correct result, "by whatever procedure is best suited to the case at hand."  Jarvis Clark, 733 F.2d at 878.  The record evidence does not support a conclusion that the Image Processors meet the statutory definition of "automatic data processing machines" covered by heading 8471, HTSUS.  See Ch. 84 n.5(A).  Such machines must be "capable of" four functions: (1) storing a processing program and data that are immediately necessary for executing that program, (2) being freely programmable with a user's requirements, (3) performing user-specified arithmetical computations, and (4) executing a processing program that requires logical decision-making, without human intervention.  Id.  Prysm presents the court with no evidence to demonstrate whether the Image Processors store a processing program, are freely programmable, or perform user-specified arithmetical computations.  When parties cross-move for summary judgment, "each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts."  Massey v. Del Labs, Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997).  Prysm has not carried that burden here.

   a. The LPD is not solely or principally used in an automatic data processing system, within the meaning of subheading 8528.51.00 and Note 5(C) to Chapter 84, HTSUS.

Preliminarily, the court observes that there is no argument that the LPDs themselves are classified under heading 8471, HTSUS.  The EN to heading 8471 emphatically "<u>excludes</u> machines, instruments or apparatus incorporating or working in conjunction with an automatic data processing machine and performing a specific function" from the definition of "automatic data processing machine."  EN 84.71(I) (emphasis in original).  Such machines "are classified in the headings appropriate to their respective functions."  <u>Id.</u>  Here, that heading is 8528.  The parties agree that the LPD's specific function is to display an image to an end-user.  Pl. Facts ¶¶ 18, 24, 31, 36, 42; Gov. Facts ¶¶ 18, 24, 31, 36, 42.  This is so whether the LPD operates in an expansive Display Wall System that contains a display wall processor, several Image Processors, and several other LPDs, wherein each LPD's function is to display image data, or whether instead the LPD operates as a "Wall of One," wherein the LPD's function likewise is to display image data.  Pl. Ex. 3 at 40:11–13, 163:1–14; Pl. Ex. 5 at 6; Dep. of Dimitris Katsis, Ph.D. at 200:10–12, ECF No. 31-3 (Nov. 2, 2017) ("Pl. Ex. 12"); Gov. Ex. B at 11–19.

As indicated,[19] Prysm maintains that even if the LPDs are not parts of a monitor, they are nonetheless classifiable as components of an automatic data processing system within the meaning of Note 5(C) to Chapter 84, which provides, in relevant part, that:

> [A] unit is to be regarded as being part of an automatic data processing system if it meets all of the following conditions:
>
> (i) It is of a kind solely or principally used in an automatic data processing system;
>
> (ii) It is connectable to the central processing unit either directly or through one or more other units; and

---

[19] <u>See</u> <u>supra</u> Part A and notes 5 & 18.

      (iii)    It is able to accept or deliver data in a form (codes or signals) which can be used by the system.

Ch. 84 HTSUS, n.5(C).  The parties agree that the LPDs satisfiy the second and third prongs of this definition, but they dispute both the scope and application of the first, which mirrors subheading 8528.51.00, HTSUS.  According to Prysm, the LPDs meet this definition because "[i]mmediately prior to importation, the principal use of LPDs was with ADP machines," so that even if its merchandise was "'put to some atypical use'" after importation, the first prong is satisfied.  Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. & Pl.'s Resp. to Def.'s Cross-Mot. for Summ. J. at 11, ECF No. 40 (June 28, 2019) ("Pl. Reply") (quoting Primal Lite, Inc. v. United States, 182 F.3d 1362, 1364 (Fed. Cir. 1999)).  The government avers that there is insufficient evidence in the record to show that the LPDs are "commercially fungible with the class or kind of goods that are principally used in ADP systems of heading 8471, HTSUS," so that the LPDs do not satisfy the first prong.  [Def.'s] Reply Mem. in Further Supp. of Def.'s Cross-Mot. for Summ. J. at 9–10, ECF No. 47 (Aug. 2, 2019) ("Gov. Reply") (citing United States v. Carborundum Co., 536 F.2d 373, 377 (C.C.P.A. 1976)).

i.      Subheading 8528.51.00, HTSUS is a use provision.

      The court construes HTSUS terms "according to their common and commercial meanings," only in the absence of "contrary legislative intent."  Carl Zeiss, Inc., 195 F.3d at 1379. Where the text of the statute inescapably contours the scope of the applicable heading with a specific, complete, and binding definition that centers upon "principal use," the court must construe the statute cohesively, applying relative provisions to their appropriate objects, to give effect to the expressed legislative intent.  See, e.g., Schlumberger Tech. Corp. v. United States, 845 F.3d 1158, 1163 n.5 (Fed. Cir. 2017); Aromont USA, Inc. v. United States, 671 F.3d 1310,

1312–16 (Fed. Cir. 2012).  Accordingly, because Note 5(C)(i) to Chapter 84 inescapably requires

the subject merchandise to be a "unit" that is "of a kind solely or principally used with an automatic

data processing system," the court concludes that Chapter Note 5(C)(i) clearly defines a use, as

does subheading 8528.51.00, HTSUS.   Thus, the applicable subheading is a principal use

provision.

> ii.    The LPDs are not monitors of a kind solely or principally used in an
>         automatic data processing system.

The court begins with ARI 1(a), the statute by which "[p]rincipal use provisions are

governed." Aromont, 671 F.3d at 1312.  ARI 1(a) provides that

> In the absence of special language or context which otherwise requires[,] a tariff
> classification controlled by use (other than actual use) is to be determined in
> accordance with the use in the United States at, or immediately prior to, the date of
> importation, of goods of that class or kind to which the imported goods belong, and
> the controlling use is the principal use.

ARI 1(a).  An article's "principal use is defined as the use that 'exceeds any other single use' in

the United States." GRK Canada, Ltd. v. United States, 761 F.3d 1354, 1362 (Fed. Cir. 2014)

(citing Aromont, 671 F.3d at 1312).  In turn, the "class or kind" inquiry examines "the group of

goods that are commercially fungible with" the subject merchandise. Primal Lite, Inc., 182 F.3d

at 1365.  To ascertain the class or kind of merchandise in a "principal use" analysis under ARI

1(a), the court evaluates "all the pertinent circumstances." Carborundum, 536 F.2d at 377.[20]

(collecting cases).  Because the Carborundum test consideration of all pertinent circumstances, the

---

[20] These circumstances include, but are not limited to (1) "the general physical characteristics of
the merchandise," (2) "the expectation of the ultimate purchasers," (3) "the channels, class, or kind
of trade in which the merchandise moves," (4) "the environment of the sale," (5) "the use, if any,
in the same manner as merchandise which defines the class," (6) "the economic practicality of so
using the import," and (7) "the recognition in the trade of this use." Carborundum, 536 F.2d at
377 (collecting cases).  Application of these factors to the subject merchandise is but "[o]ne
method" of determining the "class or kind" of the goods covered by a use provision. BenQ Am.,
646 F.3d at 1380.

court refers to the applicable ENs because, although they are not binding, they "clarify the scope

of HTSUS subheadings" and afford interpretive guidance of legislative intent.  Len-Rong Mfg.

Co., Inc. v. United States, 334 F.3d 1304, 1309 (Fed. Cir. 2003).

The issue, then, is whether the LPD is a monitor "of a kind solely or principally used in an

automatic data processing system of heading 8471."  Subheading 8528.51.00, HTSUS.  The ENs

to heading 8528 are instructive because they distinguish qualifying monitors from non-qualifying

monitors based upon a device's physical characteristics and manner of use.  Compare EN 85.28(A)

(defining monitors "of a kind solely or principally used in an automatic data processing system of

heading 84.71") with EN 85.28(B) (defining monitors "other than those of a kind solely or

principally used in" such a system).  Monitors that are classifiable in subheading 8528.51.00 "are

distinguishable from other types of monitors," and "frequently incorporate tilt and swivel adjusting

mechanisms" and "other ergonomic design characteristics to facilitate prolonged periods of

viewing at close proximity to the monitor."  EN 85.28(A).  Prysm's own evidence indicates that

its LPDs do not have these features at the time of importation.  Indeed, according to Prysm, "the

LPDs are not meant to be installed in any other way than onto the metal frame(s)" that comprise

"a metal frame wall consisting of kinematic mounts" that "precise[ly]" affix each LPD's position.

Pl. Facts ¶¶ 54–55; Gov. Facts ¶¶ 54–55.  The LPDs "are not made to sit on a desk or be used as a

television device."  Pl. Facts ¶ 55; Gov. Facts ¶ 55.  The Display Wall System, in turn, creates

"one very large display screen."  Pl. Ex. 5.

By contrast, monitors that are not classifiable in subheading 8528.51.00 include those

"devices which can generate a point of light and display it on a screen synchronously with the

source signals."  EN 85.28(B).  These monitors may receive coded signals, and "must be equipped

with a decoding device covering (the separation of) the R, G and B signals."  Id.  The LPD fits

squarely within the bounds of this definition.  Indeed, the LPD's dedicated internal CPU receives

"the proprietary packetized data generated by" the Image Processor, which it uses to control "the

intensity of the laser beam that illuminates the phosphor screen."  Gov. Add'l Facts ¶ 11; Pl. Add'l

Facts ¶ 11.  The CPU also converts the image data "into timing data," which "guide the laser beams

to light up the correct pixel location at the appropriate intensity."  Gov. Add'l Facts ¶ 12; Pl. Add'l

Facts ¶ 12.  These processors thus "decide" which "part of the image" to display on a given LPD

among the arrangement of LPDs that comprise the Display Wall System.  Pl. Ex. 3 at 61; Pl. Facts

¶¶ 99–102; Gov. Facts ¶¶ 99–102.  Moreover, the proprietary signals are in the form of R, G, B

signals, and the LPD's CPU decodes these signals.  See Pl.'s Resp. to Def.'s First Set of Interrogs.

at 21, ECF No. 37-3 (Jan. 21, 2019) ("Gov. Ex. O").  Thus, whether or not the LPDs are now

intended to receive image data from a remote automatic data processing machine, they are not

units or components of automatic data processing systems as contemplated by subheading

8528.51.00 and Note 5(C) of Chapter 84.  Accordingly, in the light of the uncontroverted evidence

of record, the court concludes that the LPDs are plainly commercially fungible with monitors other

than those of a kind solely or principally used with automatic data processing systems, rendering

classification in 8528.51.00, HTSUS incorrect.  Because the LPDs are "monitors" with flat panel

screens whose display diagonal exceeds 34.29 centimeters, without a television reception

apparatus or a cathode-ray tube, they are properly classified in 8528.59.33, HTSUS.

## CONCLUSION

For the foregoing reasons, the court holds that the subject imports are properly classified in 8528.59.33, HTSUS, subject to a duty at 5 percent <u>ad</u> <u>valorem</u>.  The court denies Prysm's motion for summary judgment and grants the government's cross-motion for summary judgment. Judgment will be entered accordingly.

    /s/ Jane A. Restani
Jane A. Restani, Judge

Dated: <u>November 26, 2019</u>
        New York, New York

[confidential appendix deleted]